518 So.2d 32 (1987)
BALDWIN MUTUAL INS. CO., a Corporation, and Frank B. Turner, an Individual
v.
Richard M. BRANTLEY.
85-359.
Supreme Court of Alabama.
April 24, 1987.
On Rehearing December 4, 1987.
Michael S. Harper of Hornsby & Schmitt, Tallassee, for appellants.
John E. Enslen and W.B. Reneau of Reneau and Reneau, Wetumpka, for appellee.
ADAMS, Justice.
This is an appeal from a judgment entered on a jury verdict in the Circuit Court of Elmore County, Alabama. Plaintiff, Richard Brantley, sued defendants, Baldwin Mutual Insurance Co., Frank Turner, and Perry Davis, for fraud and negligence in their handling of his claim for crop damage. *33 The jury found in favor of Brantley, awarding him $11,543.70 in compensatory damages, and $50,000.00 in punitive damages.
The facts upon which this jury verdict is based are as follows:
Richard Brantley is a farmer who lives in Elmore County, Alabama. In the late summer or early fall of 1981, Brantley had discussions with Perry Davis about insuring his wheat crop. Brantley called Davis because he had secured other types of insurance from Davis in the past. On October 26, 1981, Brantley went to Davis's office to complete an application for crop insurance. At this time, Davis told Brantley that he would also have to fill out an acreage report, and Davis told him for the first time about the possibility of dividing his wheat crop into separate "units." Davis also told Brantley that he (Davis) was unable to fill out an acreage report, but that someone from Baldwin Mutual's home office would be sent to help Brantley fill out the report.
On December 10, 1981, Brantley met with the representative sent by Baldwin Mutual, defendant Frank Turner. According to Brantley, it was at this time that Turner told him that if he would divide his wheat crop into eight separate units on the acreage report form, then he would have separate, independent insurance on each of these eight units. In other words, if he had a bad crop on only one unit, then the insurance would pay on that unit, even though he did not have a loss overall. Finally, Brantley alleges that Turner told him at this time that he would have to keep separate production expense records and separate harvest records on each unit in order to qualify for the insurance on each unit. Relying on these representations, Brantley had Turner complete the acreage report forms as Turner suggested. Thus, as far as Brantley knew at that time, his wheat crop was insured with Baldwin Mutual in the manner described by Turner.
In June 1982, Brantley began harvesting his wheat crop, and it was at this time that he discovered that there was a possibility of a loss on two of the eight units. Brantley sent a claim to Davis, the local agent, and told him that time was of the essence in having his claim adjusted by the Federal Crop Insurance Corporation (FCIC)[1] because he had to plant soybeans on the same land prior to July 5, 1982, in order to qualify for insurance for the soybean crop. Brantley called Davis on June 11 to see how the claim was progressing. He again emphasized to Davis his deadline for planting his soybeans. Brantley needed a quick response on his claim because, under the terms of his wheat crop insurance policy, he could not plow over his wheat field until the FCIC claims adjuster had made his inspection. Even though Brantley emphasized his necessity for quick action, there was evidence produced at trial that Baldwin Mutual took five days to mail the necessary form to Davis, and then Davis mailed incorrect information to the wrong FCIC office.
The FCIC claims adjuster did not come to inspect the wheat crop until July 6, 1982. It was at this time that the adjuster, Don Whigham, made the determination that Brantley's property did not qualify for unit division. Furthermore, since the FCIC claims adjuster did not inspect the property until July 6, one day after the July 5 deadline, Brantley was unable to secure insurance for his soybean crop planted on the two units. As a result, Brantley filed suit against the defendants for fraud and negligence in the handling of his claim. The jury found in favor of Brantley, and the defendants filed a motion for judgment notwithstanding the verdict, or in the alternative for a new trial. The trial court denied defendants' motion, and this appeal followed.
On appeal, defendants raise nine issues for our review. In essence, these issues deal with the propriety of:
1. the jury's verdict for fraud;
*34 2. the trial court's rulings with regard to requests for jury instructions and certain evidentiary matters;
3. the jury's verdict for negligence.
It is important to note at the outset that in Alabama jury verdicts carry with them a presumption of correctness, and this presumption is strengthened when the trial court denies a motion for judgment notwithstanding the verdict, or in the alternative, for new trial. American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985). Appellants, therefore, bear the heavy burden of proving that the jury's verdict, as well as the trial court's ruling on the motion, was erroneous. After having considered the evidence presented and the contentions of the parties, we are of the opinion that the jury verdict, and the judgment entered thereon, were correct.

I.
In order for the plaintiff to make out a case of fraud in Alabama, the following elements must be proven:
(1) A false representation usually concerning an existing material fact;
(2) Representation which (a) defendant knew was false when made, or (b) was made recklessly and without regard to its truth or falsity, or (c) was made by telling plaintiff that defendant had knowledge that the representation was true while not having such knowledge;
(3) Reliance by the plaintiff on the representation that he was deceived by;
(4) Reliance which was justified under the circumstances; and
(5) Damage to the plaintiff proximately resulting from his reliance.
Army Aviation Center Fed. Credit Union v. Poston, 460 So.2d 139 (Ala.1984).
With regard to the first element, Brantley alleges in his complaint that Frank Turner told him he should divide his wheat crop into eight separate field units and that there would be separate, independent insurance coverages on each of these field units; and that this would allow plaintiff to recover for a poor crop on any one or more of the eight field units notwithstanding his having a good crop on any one or more of the remaining units. At trial, Turner admitted to having told Brantley that he should divide his crop into eight units, but claimed that he conditioned this advice by stating that Brantley could recover for a loss on one or more units only if the property qualified to be divided into units. However, Brantley testified that Turner told him that the only condition to his receiving separate insurance coverage on each of these units was that he keep separate production records for each unit.
According to the testimony of Don Whigham, the adjuster for FCIC, the unit division guidelines would not allow Brantley's farm to be divided into units. When Mr. Whigham was asked if there was any advantage whatsoever for Mr. Brantley to divide his farm into eight units on the acreage report, if the farm only qualified for one unit, Whigham answered "no." Also, Mr. Whigham was asked: "[I]f Turner told Richard Brantley on December 10, 1981, that he could divide up his wheat crop into eight units so long as he kept separate production records on each unit and by doing so he would have separate insurance on each unit, would this be an untrue statement"? Whigham's response to this question was "yes." Under the circumstances, there is ample evidence in the record from which the jury could have found that Turner made a material misrepresentation of fact; namely, that all Brantley would have to do to obtain separate insurance on each unit would be to keep separate production records for each unit, when the FCIC guidelines clearly state that this property could not be divided into units.
Brantley further relied on Turner's representations by keeping separate production and expense records and separate harvest records on each of the eight units. Although he had in the past kept records in such a way as to tell what each parcel of his land was producing, the records were not completely separate. Brantley had comingled fertilizer and seed, and had even bunched together the crops after harvest. With regard to this particular harvest of wheat, though, he kept every unit separate, and testimony showed at trial that he had *35 to make extra trips to the grain elevator in order to keep the harvest on each of these eight units separate. This method was more expensive and took more time than his harvests had in the past. Such action must, of necessity, show reliance by Brantley on Turner's representation.
Finally, there is ample evidence that Brantley believed that he had separate insurance coverages on two of his units. According to paragraph 7 of his insurance policy, "No insured acreage shall be put to another use until the corporation has made an appraisal of the potential production of such acreage and consent in writing to such other use." Thus, Brantley planted his soybean crop on all fields but the two in question. Had he known that he did not have each unit insured individually, he could have gone ahead and planted his soybeans prior to the July 5 deadline. Missing the deadline not only disqualified him for any soybean crop insurance, but also these units did not produce as well as the others because of the late date of planting. Thus, the quality of Brantley's harvest of soybeans on these two units was lessened as a direct result of Turner's misrepresentations, and Brantley was not able to file a claim for crop insurance on these two units.

II.
Appellants contend that the trial court erred in refusing to give certain requested jury instructions. However, each of these requested instructions contained a misstatement of the law as it relates to the award of punitive damages. As this Court stated in American Honda Motor Co. v. Boyd, supra, if the evidence establishes an intent to deceive or defraud, punitive damages are recoverable. Since the requested jury charges stated a different standard (requiring that grossness, oppressiveness, and maliciousness be found as additional elements to be superimposed upon the requirement of intent to deceive), they would have been improper, and the court was correct in refusing to give them to the jury. A review of the record shows that the trial court gave the proper instructions to the jury regarding the award of punitive damages in this case.
Still on the subject of jury charges, appellants argue that the trial court erred in giving Brantley's requested jury charges relating to agency, where no agency was alleged in the complaint. This argument fails for two reasons. First, there was a great deal of testimony and evidence produced regarding the theory of agency, none of which was objected to by defendants at trial. Second, Brantley, in open court, prior to jury deliberations and with permission of the court, amended his complaint to include the theory of agency. It was argued by Brantley, and agreed with by the trial court, that agency was admitted in opening arguments.
Appellants also argue that the trial court erred in allowing Brantley to introduce testimony regarding the size of Baldwin Mutual. First, in this regard, an agent of Baldwin Mutual was put on the stand by the appellants, and in his testimony he described Baldwin as "a very small company." He went on to describe what type of company it was, who owned the company, and who the company served. On cross-examination, the witness was asked how many policyholders Baldwin Mutual had in Alabama. Counsel for appellants objected, based on relevancy, but the court ruled that the testimony was admissible because the "door had been opened" on direct examination with regard to the size of the company. The witness testified as to how many policyholders Baldwin Mutual had; then the question was asked "How many millions of dollars worth of insurance coverage do 27,000 policyholders have?" Counsel for appellants objected and moved for a mistrial, stating that this question was an attempt on the part of the plaintiffs to put into evidence the poverty or wealth of a party to a lawsuit. The court allowed the witness to testify over objections, and the witness's answer was "I don't know."
We agree with the trial court that the first question was proper impeachment procedure, as the subject was brought out on direct examination. The appellants were not harmed by the second question because of the witness's answer that he did not *36 know how many policyholders Baldwin Mutual had.

III.
With regard to the negligence issue, Baldwin Mutual argues that there was insufficient evidence before the jury to justify a finding that Baldwin Mutual was negligent in the handling of Richard Brantley's claim. We disagree.
As we have already stated, a jury verdict is presumed to be correct. This Court will not set aside a jury verdict unless it is without supporting evidence or is so contrary to the evidence as to be wrong or unjust. Harris v. Meadows, 477 So.2d 374 (Ala.1985). First, Baldwin Mutual undertook the task of helping Richard Brantley complete his claim for insurance proceeds. It is axiomatic that one who assists another binds himself to exercise due care. Not only did Baldwin Mutual know that Richard Brantley possessed limited knowledge of the proper way in which to complete the required forms, but it also knew that time was of the essence concerning the processing of his claim. In spite of this knowledge, there was evidence adduced at trial that agents for Baldwin Mutual sent out incomplete information, mailed things at a leisurely pace, and even mailed them to the wrong office. Considering what the jury had before it, we cannot say that its findings were totally unsupported by the evidence or manifestly unjust or wrong.
To summarize, there was evidence presented that Frank Turner was sent by Baldwin Mutual to help Richard Brantley fill out his acreage report forms in order to get crop insurance on his farm. There was testimony produced at trial from which the jury could have concluded that Turner led Brantley to believe that all he needed to do in order to receive separate insurance coverages on each of his units on his farm was to keep separate production records. Brantley did this, and it was not until after the FCIC claims adjuster visited the farm that Brantley found out that his farm did not qualify for unit division. By this time, Brantley had already expended extra time and money in changing his harvesting procedures to abide by the terms of his insurance policy, and had waited past the deadline for obtaining insurance on his new soybean crop on two units.
For all of the above-stated reasons, the judgment on the jury verdict is affirmed.
AFFIRMED.
JONES, SHORES and STEAGALL, JJ., concur.
TORBERT, C.J., concurs in the result.

ON APPLICATION FOR REHEARING
ADAMS, Justice.
On rehearing, the appellants, Baldwin Mutual Insurance Company, et, al., raise two issues for this Court's review. First, they argue that defendant Turner did not make misrepresentations to Brantley concerning the insurance coverage. We are of the opinion that we decided that issue correctly in Brantley's favor in our original opinion. Second, they argue that the trial court erred in allowing the jury to award punitive damages. We did not address this issue in our original opinion. We do so now, and find no error by the trial court.
The appellants argue that Brantley failed to offer any evidence that they intended to deceive him; therefore, they argue, the jury should not have been permitted to award punitive damages, citing American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985) and § 6-5-103, Code of Alabama 1975. The defendants are correct in stating that where an intent to deceive has been shown, punitive damages are allowable; however, they are also allowable for wanton and reckless misrepresentations. American Honda, supra; S.S. Steele & Co. v. Pugh, 473 So.2d 978 (Ala.1985).
Brantley's complaint for fraud contains an alternative allegation that would permit the jury to award punitive damages. That is, plaintiff alleged that either Baldwin Mutual's representations were false and were known to be false, or the defendants were reckless with intent to deceive in making the representations not knowing they were *37 false. The evidence presented to the jury, and stated in our original opinion, and as apparently accepted by the jury, showed that Turner had actual knowledge that Brantley's wheat crop did not qualify under the FCIC guidelines or that Turner had no knowledge of the FCIC guidelines and, therefore, recklessly misrepresented the truth with intent to deceive. Therefore, the jury had ample basis to award punitive damages. No error resulted from permitting the jury to decide whether to award punitive damages. Therefore, the judgment of the trial court is due to be affirmed.
REHEARING GRANTED; OPINION EXTENDED; AFFIRMED.
TORBERT, C.J., and JONES, SHORES and STEAGALL, JJ., concur.
NOTES
[1] The (FCIC) is the government agency which actually insures crops for and on behalf of the United States Government. Pursuant to an Act of Congress, the FCIC uses private insurance companies, such as Baldwin Mutual, to market its farm crop insurance policies.